706 So.2d 636 (1998)
Johnnie Ray ALLEN, Plaintiff-Appellant,
v.
LOUISIANA WOOD MOULDING CORPORATION, Defendant-Appellee.
No. 29947-WCA.
Court of Appeal of Louisiana, Second Circuit.
January 23, 1998.
*637 David P. Daye, Shreveport, for Plaintiff-Appellant.
Wiener, Weiss & Madison by Larry Feldman, Jr. and Mark L. Hornsby, Shreveport, for Defendant-Appellee.
Before MARVIN, C.J., and HIGHTOWER, STEWART, GASKINS and CARAWAY, JJ.
CARAWAY, Judge.
Johnnie Ray Allen appeals a judgment from the Office of Worker's Compensation denying him worker's compensation, rehabilitation and medical benefits and penalties and attorney fees. Allen was injured in a work-related accident involving an industrial table saw and sustained cuts to the middle and ring fingers of his left hand. Dismissing the claim, the hearing officer found that Louisiana Wood Moulding Corporation, the employer, had met its burden of proving the affirmative defense under La. R.S. 23:1081(1)(c), which provides that "[n]o compensation shall be allowed for an injury caused ... by the injured employee's deliberate failure to use an adequate guard or protection against accident provided for him." Since we find that Allen took no deliberate action to discard a safety device or guard, we *638 reverse the judgment of the hearing officer and render judgment for the applicable worker's compensation remedies.

Facts
Plaintiff was injured on March 16, 1995 at the Louisiana Wood Moulding Corporation (LWMC) plant when the fingers of his left hand contacted a moving saw blade within the machine he had been operating. Plaintiff stated that although he had cut off the power to the saw, the blade, still spinning, cut his fingers when he attempted to clear debris from the sawdust suction unit.
At the time of his injury, Allen was operating the "Whirlwind" saw. The entire saw mechanism for the Whirlwind saw, including the blade, was housed in a metal encasement or cabinet with an access door. A metal guard covered that part of the circular saw blade extending above the encasement on the table saw when cutting. The Whirlwind saw was one of two types of saws Allen had operated at the plant. In the preceding months, he spent most of his time on a different "Industrial" saw. The Industrial saw had an internal blade guard on the blade below the table, whereas the Whirlwind saw, contained in the metal cabinet, did not.
At the time of the accident, Allen had been operating the Whirlwind saw only about an hour when the saw began to spray sawdust. Allen testified that David Nutt, the LWMC plant supervisor, was at hand and instructed him to check to see if the suction vent line was clogged. Nutt denied this, maintaining that he merely told Allen to turn off the machine. Nevertheless, Nutt never claimed to have given Allen any other directive at that moment preceding the accident.
In order to check the suction system, Allen cut the power off and immediately opened the door to the encasement. Allen stated that he had similarly cleared the suction system on the Industrial saw which became clogged with wood chips on a daily basis. Unlike the Industrial saw and unbeknownst to Allen on this day, the Whirlwind saw had no blade guard. When he opened the door and reached inside to the area of the suction system, the fingers of his left hand came into contact with the still-spinning, unshielded saw blade.
Allen was treated by Dr. John Knight for severe lacerations to the middle finger and ring finger of the left hand. Allen had partial extensor tendon and flexor tendon lacerations to the hand as well as some ligament damage to several joints of the hand. Dr. Knight surgically repaired the severed nerves, ligaments, vessels and tissue. Dr. Knight followed Allen's recovery until late June.
On April 3, 1995 defendant attempted to return to work in response to an offer to perform light-duty, one-handed work. According to LWMC, the assigned job involved placing and rotating a single piece of wood on a machine sander and could be accomplished without the significant use of Allen's left hand. Nevertheless, Allen could work only a few days in April at this light duty task as his disability continued to plague him. Dr. Knight acknowledged in an April 19 memo that due to Allen's continuing problems with his hand and his need for physical therapy, Allen should be excused from his attempt at the light duty work.
Thereafter, through June, LWMC paid Allen temporary total disability benefits while plaintiff received continued medical attention and physical therapy from Dr. Knight and Dr. Glenn Sholte. Also, during the course of this medical treatment through June, certain medical procedures were authorized and paid by approval of Michelle Marcello, the adjuster for LWMC's self-insurance fund.
On June 21, 1995, Dr. Carl Goodman performed an independent medical examination and concluded that Allen could do light work activity so long as he was not using the left hand. He essentially agreed with Dr. Knight's findings regarding referral to pain management for treatment of Allen's reflex sympathetic dystrophy, a painful condition in his injured hand, the treatment of which would require nerve block injections. On June 29, 1995, Dr. Knight also approved Allen for right-handed light work duty if it did not interfere with his continuing need for therapy.
In his testimony, Dr. Knight stated that, as of June 29, 1995, he believed Allen could perform the job he had performed for the *639 few days in April if it did not involve use of the injured hand. This particular job involved sanding the ends of carved pieces of four and one-half ounce wooden blocks, approximately 4 inches by 6 inches in size, and throwing them into a bin.
Following a request on July 5 for further medical treatment pertaining to Allen's nerve rehabilitation, Marcello reviewed the case by telephone conferences with both Allen and Dr. Knight. At that time, Dr. Knight told her that Allen could return to work with the modifications and the accommodations that LWMC would make for him. She testified that she did not recall discussion of Allen's need for daily physical therapy in Shreveport. However, the written medical reports of Knight and Goodman, which were received by Marcello, both reflect the need for continuing therapy.
At this same time in early July, Marcello was also discussing with her superiors the fact that Allen appeared to have ignored a "safety feature" of the saw, i.e., its encasement in the metal box. She testified that the decision was made at that time to controvert the claim for worker's compensation benefits. It was believed that LWMC had a strong defense under La. R.S. 23:1081(1)(c).
By letter to Allen dated July 5, 1995, LWMC acknowledged notification of Dr. Knight's recommendation for work and offered to Allen "one-handed, light duty" employment beginning on Monday, July 10, 1995. The letter also stated that Allen's absence on Monday would be considered a refusal of the job offer. No mention of any allowance for Allen's physical therapy was made in the letter.
By another letter to Allen dated July 6, 1995, Marcello further advised him that coverage under worker's compensation was discontinued and that Allen would be thereafter responsible for all medical treatment of his injuries. Marcello also advised Dr. Knight on July 6 that LWMC would no longer pay for Allen's treatment.
Allen did not return to work on July 10 or thereafter. He testified that he was still experiencing pain in his hand at that time. He further testified that he did not understand that Dr. Knight had approved his return to the light duty assignment.
Allen visited Dr. Knight again on June 12, 1996 five months prior to trial. Dr. Knight testified that his diagnosis was essentially unchanged. Allen still exhibited symptoms of reflex sympathetic dystrophy and continued pain in the same digits. Dr. Knight felt that with maximum therapy and pain management, Allen would be doing better than he was at the time. He reiterated, however, that Allen could return to one-handed duty so long as he was getting the physical therapy and pain management he recommended.
At trial in November, 1995, Allen indicated that his hand had improved, although it was still in a weakened state. He also indicated that he could have performed at that time the light duty work previously offered by LWMC.

Discussion
No worker's compensation benefits are allowed for injuries caused by the employee's deliberate failure to use an adequate guard or protection against an accident that has been provided for him. La. R.S. 23:1081(1)(c). The employer bears the burden of proving its defense. La. R.S. 23:1081(2). The failure or refusal to use the provided safety device must be shown to be intentional and willful. Holcomb v. Fowler, 305 So.2d 616 (La.App. 2d Cir.1974), writ denied, 309 So.2d 679 (La.1975); Gooch v. Standridge Brothers, 478 So.2d 980 (La.App. 5th Cir.1985), writ denied, 481 So.2d 1351 (La.1986). The employer must also demonstrate that the safety device was provided solely as a guard or protection and that the employee had knowledge of its function and adequacy. Lee v. Smith, 248 La. 16, 176 So.2d 413 (1965); King v. Grand Cove Nursing Home, 93-779 (La.App. 3d Cir. 03/09/94), 640 So.2d 348, writ denied, 94-0865 (La.05/13/94), 641 So.2d 204.
In Haven v. Munson, 169 So. 819 (La.App. 1st Cir.1936), a worker lost his arm while attempting to unclog a cotton gin. A hopper devise, which the plaintiff removed in order to get underneath the gin to unclog it, served the dual purpose of catching the seed from the saws of the gin and as a guard against *640 the moving machinery. The court held that under the circumstances "to an employee, unfamiliar with intricate machinery ..., the hopper would appear to him as no more a guard or protection than any other part of the gin." Id. at 821.
A well reasoned, early opinion by this court involved the compensation claim of a carpenter who failed to use a ladder and was injured from a fall after climbing up the wooden forms used in the construction of a cement pier for a bridge. Cole v. List & Weatherly Construction Co., 156 So. 88 (La. App. 2d Cir.1934). After holding that the ladder was not a guard or protection device within the meaning of the statute, this court further ruled:
In the present case there was no element of willfulness, though the failure to use the ladder was intentional. The workman was hurrying to tear down the forms. The ladder was against the pier, several feet from the intersection of the bracing timbers, and being used by the co-worker. We are satisfied that Cole, though warned by his co-workers and generally instructed to use the ladder, climbed the timbers with no other thought than to hasten and facilitate the work that he was employed to do. His action was ill-considered, negligent, and intentional, but not deliberate or willful.
It is well settled in this state that mere disobedience of orders as to how work should be done will not affect the right of the workman to compensation. (Citations omitted).
Even if an act is done in disobedience of special rules and in spite of warnings, if it is done in an honest attempt to further that which he was employed to do, compensation is not barred, even if it is done in a more dangerous way.
In this case, Allen's removal of the door of the metal cabinet to inspect the suction line was not, in our opinion, a deliberate discarding of an adequate guard within the meaning of the statute. From his experience with the Industrial saw, Allen could reasonably believe that the underside of the saw blade was shielded by a specific blade guard, which he had no intent to remove. The door, by its very nature, invited its opening or removal for inspection procedures. Allen did not discard a safety device. He simply did not appreciate the danger of what turned out to be, to his unpleasant surprise, an unguarded blade. The statute provides a defense against the actions of an employee who knowingly removes a safety device to expedite or ease the workload while recognizing the greater risk created by those actions. Allen did not take that dare and run that risk. His heedless and careless act was common negligence within the protection of the worker's compensation bargain under the law.
Likewise, we reject LWMC's argument regarding Allen's disobedience of safety instructions which prohibited him and other employees from performing maintenance on the machinery. Allen's actions, despite those instructions and however careless, were performed in a good faith effort to continue his work task in the presence of his supervisor, who was also attempting to alleviate the sawdust problem on the other side of the table saw where the suction line exited the machine. The pronouncement of the law in Cole, supra, is equally applicable in this instance.
In view of this ruling, LWMC made the improper decision to deny Allen the medical benefits for physical therapy at the time that Allen's disability was beginning to be resolved. LWMC's duty under La. R.S. 23:1226 to provide Allen with rehabilitative services in the form of a "modified position" of employment was nevertheless partially performed. At the same time, Allen improperly rejected LWMC's offer to provide him with the light duty work position which Dr. Knight had approved.
Under these circumstances, the record clearly demonstrates that Allen, who needed daily therapy in July, 1995, was incapable of earning 90% of his pre-injury wage. Supplemental earnings benefits (SEB) are therefore appropriate. La. R.S. 23:1221(3)(a); Banks v. Industrial Roofing & Sheet Metal Works, Inc., 96-C-2840 (La.7/1/97), 696 So.2d 551.
*641 The difficulty in this case of determining in retrospect when the SEB payments may have ended is created by LWMC's action in refusing further medical benefits for therapy. By the time of trial, however, Allen admitted that the condition of his hand had improved, and he failed to show as of that time that he remained incapable of earning 90% of his former wage. Accordingly, we award SEB payments from July 10, 1995 through the date of trial on November 7, 1996 based upon Allen's ability to have earned only 70% of his former wage. As of the time that LWMC refused benefits, 30% of Allen's work day was required to be spent in physical therapy. Accordingly, SEB payments in the amount of $48.00[1] per week are owed from July 10, 1995 through the date of trial, together with interest on each installment, at the legal rate, from the date each installment came due. Additionally, defendant is cast in judgment to pay the following: $1,064.00 for medical treatment at LSU Medical Center; $250.00 for treatment by Dr. Knight on July 12, 1996; and, $542.18 mileage expenses for treatment.
Finally, Allen also contends that penalties and attorney's fees should be awarded. By Act No. 1137 of 1995, effective on June 29, 1995, immediately before this controversy, the provisions regarding penalties and attorney's fees under Sections 1201 and 1201.2 of the Worker's Compensation Act were amended, as follows:
§ 1201. Time and place of payment; failure to pay timely; failure to authorize; penalties and attorney fees
* * * * * *
F. Failure to provide payment in accordance with this Section shall result in the assessment of a penalty in an amount equal to twelve percent of any unpaid compensation or medical benefits or fifty dollars per calendar day, whichever is greater, for each day in which any and all compensation or medical benefits remain unpaid, together with reasonable attorney fees for each disputed claim; however, the fifty dollars per calendar day penalty shall not exceed a maximum of two thousand dollars in the aggregate for any claim. Penalties shall be assessed in the following manner:
* * * * * *
(2) This Subsection shall not apply if the claim is reasonably controverted or if such nonpayment results from conditions over which the employer or insurer had no control.
§ 1201.2. Discontinuance of payment; attorney fees
Any employer or insurer who at any time discontinues payment of claims due and arising under this Chapter, when such discontinuance is found to be arbitrary, capricious, or without probable cause, shall be subject to the payment of all reasonable attorney fees for the prosecution and collection of such claims. The provisions of R.S. 23:1141 limiting the amount of attorney fees shall not apply to cases where the employer or insurer is found liable for attorney fees under this Section. The provisions of R.S. 22:658(C) shall be applicable to claims arising under this Chapter.
This 1995 legislation appears to provide two substantive tests for the award of attorney's fees. Section 1201(F)(2) provides that an employer that does not "reasonably controvert" a claim and fails to provide payment of benefits shall be liable for attorney fees. Section 1201.2 provides that an employer that discontinues payment of claims in a manner which is "arbitrary, capricious, or without probable cause" shall be liable for attorney's fees.
Previously, after the 1983 amendments to the Act, the former of these tests, the reasonable controversy test, had applied only for the imposition of penalties whereas the latter test, the arbitrary and capricious test, had applied only for the imposition of attorney's fees. See former La. R.S. 23:1201(E) and 1201.2 prior to 1995 legislation. Nevertheless, the post-1983 jurisprudence did not draw any significant distinction between the two and at times articulated the test for both *642 penalties and attorney's fees as a single test. See, e.g. Bowens v. General Motors Corporation, 608 So.2d 999 (La.1992), where the defendant was found to be "unreasonable" (as opposed to arbitrary or capricious) in its assertion of a defense and found liable for attorney's fees.
Likewise, under the facts of this case, with these two attorney's fees provisions before us, we find no distinction which would exclude the application of either one of these statutes based upon LWMC's act of "discontinuance" of the medical and wage benefits in July, 1995, and its "failure to provide payment" of those benefits thereafter. Therefore, with both statutes possibly applicable to LWMC's non-payment in this instance, we choose to apply the single test of Section 1201(F)(2) to determine whether both attorney's fees and penalties may now be awarded.
In testing for a "reasonably controverted" claim under former Section 1201(E), the jurisprudence provides that a claim is reasonably controverted if the employer (or insurer) had sufficient factual and medical information to reasonably counter the factual and medical information presented by the claimant. Allen v. Misco Paper, 27,146 (La. App.2d Cir. 8/23/95), 660 So.2d 175; Savoy v. Cecil Perry Improvement Co., 96-889 (La. App. 3d Cir. 2/5/97), 691 So.2d 692; Watson v. Amite Milling Co., Inc., 560 So.2d 902 (La.App. 1st Cir.1990). In other cases where facts were not in dispute, a defendant could reasonably controvert a legal issue involving coverage or a statutory defense where the "issue was not conclusively resolved by the jurisprudence at the time that the claim was made." Williams v. Regional Transit Authority, 546 So.2d 150, 162 (La.1989); see also Bowens v. General Motors Corporation, supra. Thus, in order to avoid penalties and attorney fees under the "reasonably controverted" test, the employer must propose a defense having a sound basis in fact or in law.
From our view of this case in overruling the hearing officer's recognition of LWMC's defense, we did not deem it necessary above to discuss the manifest error rule pertaining to any factual controversy. The issue in dispute was more of law than of fact. While accepting LWMC's factual contentions regarding the general safety feature of the table saw encasement and Allen's disobedience to the corporation's safety instructions, we do not view those facts as establishing the narrow defense afforded an employer under Section 1081(1)(c). The uncontroverted facts do not, as a matter of law, afford LWMC a defense.
The language of the statute relied upon by LWMC has been contained in Louisiana worker's compensation law since 1914. In commenting upon the historical interpretation of this act, Professor Johnson states:
If this defense were interpreted with liberality toward the employer, it could serve virtually to abrogate the notion that the worker's negligence does not deprive him of his compensation claim. The defense of failure to use a guard or protection, however, has been strictly construed; and although there is considerable reference to it in the opinions, the cases in which it has been used to defeat a claim have been relatively few.
Malone and Johnson, 14 Louisiana Civil Law Treatise: Worker's Compensation Law and Practice (3d ed.1994) § 343. From our review of the jurisprudence, this assessment is accurate.
In those rare cases where this Section 1081 defense has been recognized, two involved a situation where a specific safety device was called to the attention of the employee immediately before the accident, and where the employee, in each instance, choose to reject the use of the device. Pigott v. Raymond Concrete Pile Co., 8 La.App. 428 (1st Cir.1928) and Carter v. Christ, 148 So. 714 (La.App.1933). In this instance, Allen's accident occurred as a result of his spur of the moment decision to remove the door and clear the suction lines. No specific safety guard was removed from the saw blade which would place this case sufficiently close to the statutory defense, as that defense has been historically interpreted. Accordingly, we find that the legal issue asserted on the facts of this case did not rise to the level of a reasonably controverted claim which would justify the withholding of benefits from the *643 injured employee, undisputedly harmed on the job and in need of medical benefits.
Applying the sanctions of Section 1201(F)(2) in this case, we are mandated to assess the maximum penalty of $2,000, and we determine a reasonable attorney's fee for the trial and appeal of this case to be $2,500.

Conclusion
For the reasons, stated hereinabove, the judgment is reversed. We render judgment in favor of the plaintiff, Johnnie Ray Allen, for supplemental earnings benefits and medical benefits, and for the penalties and attorney's fees as set forth above. Defendant is cast for costs of this appeal.
REVERSED AND RENDERED.
HIGHTOWER, J., dissents in part with written reasons.
GASKINS, J., dissents.
HIGHTOWER, Judge, dissenting in part.
An employee places his hand inside a running industrial saw after the plant supervisor reportedly told him to turn off the machine. At numerous prior safety meetings, the employee has repeatedly received instructions concerning the careful maintenance of the machinery and, indeed, consistent warnings appear on the encasement itself.
Relying upon the defense accorded by La. R.S. 23:1081(1)(c), the employer submits its evidence at trial. The worker's compensation judge sustains that position, finding that:
(1) the employer provided a safety device designed to prevent the specific harm in question;
(2) the device was effective and in place; and,
(3) the employee deliberately failed to use the device with which he was well aware. Yet despite the employer having successfully demonstrated its defense at the trial level, the majority now concludes on appeal that the claim has not been "reasonably controverted."
Obviously, the worker's compensation judge, to whose findings we are mandated to give great weight, concluded that the employer had a reasonable basis to believe benefits were not due. Thus, while ultimately concurring that the jurisprudence does not adequately underpin the Section 1081(1)(c) defense in this instance, I can by no means countenance the imposition of penalties and attorney's fees. Cf. discussion in Banks v. Industrial Roofing, supra. Nor, quite frankly, do I understand how four members of this panel can do so.
Accordingly, I dissent from the awarding of penalties and attorney's fees.
NOTES
[1] This amount is based upon the $240 average weekly wage stipulated by the parties, times 30% times two-thirds ($240 × .30 × .666).