917 So.2d 733 (2005)
David HAMMOCK, Plaintiff-Appellee,
v.
WEYERHAEUSER, Defendant-Appellant.
No. 40,464-WCA.
Court of Appeal of Louisiana, Second Circuit.
December 14, 2005.
*736 Gold, Weems, Bruser, Sues & Rundell by Peggy Dean St. John, Michael John O'Shee, Alexandria, for Appellant.
*737 Street & Street by Curtis Daniel Street, Monroe, for Appellee.
Before PEATROSS, DREW and MOORE, JJ.
DREW, J.
In this workers' compensation case, claimant David Hammock suffers from a serious back injury that he attributes to a work-related accident. The claimant did not contemporaneously report the accident, which was unwitnessed, and Weyerhaeuser, the employer, refused to pay compensation benefits when the claimant reported the accident several months later. The claimant made a formal claim for compensation, and the Workers' Compensation Judge ("WCJ") found for the claimant and awarded him indemnity benefits, penalties, and attorney fees. Weyerhaeuser appeals. We amend and affirm.

FACTS
David Hammock was employed by Weyerhaeuser at its lumber mill in Dodson, Louisiana, as a "green end off-bearer." Hammock's duties required him to move wood veneer off a conveyor belt, grade the wood, and, using buggies, move it from a stacking machine to another location. During this operation, the sheets of veneer sometimes fell off the stacking machine and stopped the machine from operating, at which time the workers would have to manually move the approximately 3,000-pound load of veneer off of the machine.
Hammock testified that on an unspecified date in August 2002,[1] the stacking machine malfunctioned in this manner. He said that he and a co-worker, Roy Poland, then pushed the stack of veneer to clear the machine, and that in the process he felt "a popping in my lower back and a tingling in my legs." Hammock did not report this incident when it happened, although he testified that he said "ouch" and told Poland that he thought he felt something in his back. Poland recalled moving a load of veneer with Hammock once or twice but did not remember Hammock complaining about his back. Hammock stated that soon thereafter, he told other co-workers, Robert Thompson and Kenny Ayers, about the incident. Thompson remembered Hammock complaining about his back pain and attributing the pain to pushing a load of veneer at work. Ayers remembered Hammock telling him in 2002 that he had hurt his back pushing a load of wood and asking Ayers whether or not he should tell the supervisor about the incident.
Hammock had previously been a supervisor with Weyerhaeuser and was familiar with Weyerhaeuser's policy requiring employees to report accidents. However, Hammock testified that he deliberately elected not to formally report his injury to the company out of fear that a reported accident would interfere with his chances of being promoted to training supervisor and might contribute to the risk of Weyerhaeuser closing the Dodson plant. Hammock also did not make a note of the injury in his personal journal, which he explained by stating that "other people had access to my journal and I didn't ... really want to report the incident as an accident."
Hammock testified that after this incident, he began to suffer from persistent back pain and tried without success to obtain relief with home remedies. He first told his supervisor, Robert Gorham, about his incident and the associated pain on November 7, 2002. Gorham testified that Hammock asked "how he could go to the doctor with his back without having an *738 accident, you know, claim on the company." Gorham recalled Hammock saying that the accident had occurred three to four months earlier.
Hammock stated that Gorham was his supervisor at the time of the incident, and that his previous supervisor had been a man named O.C. Foster, with whom he did not have a good relationship. Another employee, Michael Skipper, stated that Foster was still Hammock's supervisor when Hammock said he hurt himself. Yet another employee, Gary Hemphill, also testified that Hammock told him that Foster was his supervisor at the time of the accident. According to Hemphill, Foster had been fired in May of 2002.
Hemphill also testified that Hammock told him that he did not want to report the incident out of fear that the plant would be shut down. None of the employees questioned agreed that a reported injury would likely cause the plant to close. However, Hammock had previously worked for Weyerhaeuser at a Ruston plant that had been closed, albeit not because of reported accidents. Weyerhaeuser foreman Albert Barnes testified that the company encourages employees to report accidents and that an accident report would not have an impact on the company's decision to promote an employee to a supervisory position or any other negative consequence.
In early December 2002, Hammock saw an orthopedist, Dr. Myron Bailey. On December 18, 2002, Dr. Bailey ordered that Hammock perform only light duty work for four weeks. On January 6, 2003, Hammock made a formal report of his accident. In the report, he wrote "do not know" in the field for "Date of Accident" and wrote "3 mos. ago" in the field for "Time of Accident."
Prior to the accident, Hammock suffered from debilitating migraine headaches that sometimes caused him to miss work. For treatment of these headaches, Hammock had been seeing a neurologist, Dr. Michael Ehrlich. On January 13, 2003, Hammock saw Dr. Ehrlich and complained of his lower back pain. Dr. Ehrlich examined the claimant and found spasm in his lumbar area, for which Dr. Ehrlich prescribed muscle relaxants and anti-inflammatory medicine and ordered Hammock not to work.
Hammock saw Dr. Bailey again on January 15, 2003, after he had an MRI scan of his back. Dr. Bailey's note indicates that the MRI was "essentially normal except that he does have some increased thickness of the ligamentum flavum at 2 levels, the L4-5 and L5-S1 and very mild disc protrusions." Dr. Bailey recommended that Hammock go to pain management. He also ordered that Hammock refrain from working, and this order was made retroactive to January 2, 2003, and extended to February 15, 2003.
On January 27, 2003, Hammock saw Dr. Ehrlich again, at which time Dr. Ehrlich ordered physical therapy. Hammock underwent physical therapy but reported no improvement in his back pain. In addition, Hammock reported that his back problem increased the frequency and intensity of his migraine headaches.
Weyerhaeuser refused to pay indemnity or medical benefits for the claimant. Hammock recalled that he might have worked only one or two days after being ordered off work by his physicians in December 2002. Hammock filed a formal claim for compensation on April 30, 2003.
In June 2004, Weyerhaeuser sent the claimant to see Dr. Rayland Beurlot for an examination. Dr. Beurlot first performed a sensory exam and found normal results except for "a decrease over the posterior thigh subjectively coming over to the lateral calf and down the lateral border of the *739 left foot." During the exam, Hammock complained of a significant increase in low back pain during hip flexion and extension but nevertheless was able to "generate a reasonable effort." After an extensive review of Hammock's medical history, the doctor stated in his report that Hammock was deconditioned, that "the degree of back pain is subject to question," and opined that Hammock could benefit from therapy and work hardening. Dr. Beurlot said that the claimant could work but with restrictions best determined by a functional capacity examination. The doctor concluded by stating that "the permanent injury from this alleged incident is highly questionable," that he did not find any direct correlation between his back pain and his headaches, and that the injury was likely a soft tissue injury that would likely have resolved given the length of time elapsed since the incident.
The claimant continued to see Dr. Ehrlich through November of 2004 with continued complaints of back pain and worsening migraine headaches. Dr. Ehrlich repeatedly ordered that the claimant not work, and on August 11, 2003, flatly stated "He is off work" in his exam report. In November of 2003, Dr. Ehrlich wrote, "I am hoping that he will be approved for treatment. This gentleman is really suffering quite a bit." There is no suggestion of malingering in the medical reports from Dr. Ehrlich.
Various neurological tests were recommended by the doctors but the tests were not performed due to Hammock's inability to pay for them. Hammock became unable to pay Dr. Ehrlich for treatment in early 2004; however, Dr. Ehrlich continued to examine Hammock for free for several visits and provided him with free samples of the medications he needed. Hammock also occasionally went to a local hospital's emergency room for treatment. Hammock's condition remained essentially unchanged throughout the course of treatment. In July of 2004, Dr. Ehrlich reported, "There is no way he could return to work. It would not be safe."
Trial was held in January 2005. In addition to the evidence noted above, the claimant testified that he still was unable to work due to continuing back pain and that this pain originated with the injury he said he suffered while pushing the wood. The claimant further testified that he was unable to work because physical activity "usually trigger[s] a migraine with the pain and everything."
The WCJ took the case under advisement and on March 7, 2005, issued verbal reasons for judgment. After a thorough review of the claimant's medical history, the WCJ stated:
An assessment of the testimony presented and the medical evidence introduced persuades this Court that claimant was, in fact, involved in a work-related accident. His version of the accident is unchanged. He was a very credible witness.
The WCJ also opined that Hammock's "perception that the reporting of accidents was unfavored by defendant had a plausible basis and it cannot be used to preclude workers' compensation benefits." The WCJ concluded that Hammock was temporarily totally disabled ("TTD") and entitled to TTD benefits from January 2, 2003. The WCJ further found that the employer failed to reasonably controvert Hammock's claim for benefits and so awarded him $2,000.00 in penalties and $7,000.00 in attorney fees. The WCJ signed a judgment in accordance with these reasons on May 9, 2005, and this judgment ordered that Weyerhaeuser pay TTD benefits from January 2, 2003, "until plaintiff is released to return to work by Dr. Ehrlich...." The judgment also ordered *740 that the employer "provide and pay for all reasonable and necessary medical treatment for the plaintiff's work related injury, as required by law." From that judgment, Weyerhaeuser now appeals.

DISCUSSION
Weyerhaeuser's primary argument on appeal is that the WCJ committed error in finding that Hammock had a work-related injury. In the alternative, Weyerhaeuser contends that the WCJ erred in:
 awarding temporary total disability benefits;
 rendering a judgment that is indefinite, imprecise and uncertain;
 failing to give Weyerhaeuser credit for the sums previously paid by it for Hammock's medical expenses;
 awarding a penalty and attorney fees to Hammock; and
 awarding an excessive amount of attorney fees.

Existence of a work-related injury
A plaintiff in a workers' compensation action has the burden of establishing a work-related accident by a preponderance of the evidence. Graham v. Nissan, 39,656 (La.App.2d Cir.6/29/05), 907 So.2d 213. If the evidence is evenly balanced or shows only some possibility that a work-related event produced the disability or leaves the question open to speculation or conjecture, then the plaintiff fails to carry the burden of proof. Player v. International Paper Co., 39,254 (La.App.2d Cir.1/28/05), 892 So.2d 781.
The worker's testimony alone may be sufficient to satisfy this burden, provided that two elements are satisfied: first, there must be no other evidence which discredits or casts serious doubt on the worker's version of the incident; and second, the worker's testimony must be corroborated by the testimony of fellow workers, his spouse and other close family members, friends, or the introduction of medical evidence. Bruno v. Harbert International, Inc., 593 So.2d 357 (La.1992); Kidd v. Brown Radiator & Frame, 38,729 (La.App.2d Cir.12/22/04), 890 So.2d 796, writ denied, XXXX-XXXX (La.3/24/05), 896 So.2d 1042. If a claimant's testimony contains discrepancies and inconsistencies, that testimony alone does not meet the burden. Harris v. General Motors, Truck and Coach Div., 577 So.2d 1160 (La.App. 2d Cir.1991).
Whether the claimant has carried his burden of proof and whether testimony is credible are questions of fact to be determined by the WCJ. Lewis v. Chateau D'Arbonne Nurse Care Center, 38,394 (La.App.2d Cir.4/7/04), 870 So.2d 515. Factual findings in a workers' compensation case are subject to the manifest error or clearly wrong standard of appellate review. Culotta v. A.L. & W. Moore Trucking Company, 35,344 (La.App. 2d Cir.3/5/03), 839 So.2d 1063, writ denied, XXXX-XXXX (La.5/30/03), 845 So.2d 1052. When there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel its own inferences and evaluations are as reasonable. Rosell v. ESCO, 549 So.2d 840 (La.1989).
La. R.S. 23:1301 provides:
No proceeding under this Chapter for compensation shall be maintained unless notice of the injury has been given to the employer within thirty days after the date of the injury or death. This notice may be given or made by any person claiming to be entitled to compensation or by anyone on his behalf.
La. R.S. 23:1305 provides:
A notice given under this Subpart shall not be held invalid or insufficient by *741 reason of any inaccuracy in stating the time, place, nature, or cause of the injury, or otherwise, unless it is shown that the employer was in fact misled to his detriment thereby. Lack of notice or delay in giving notice shall not be a bar to proceedings under this Chapter if it is shown that the employer, or his agent or representative, had knowledge of the accident or that the employer has not been prejudiced by such delay or lack of notice.
See also Holcomb v. Bossier City Police Department, 27,095 (La.App.2d Cir.8/25/95), 660 So.2d 199.
A delay in reporting an injury is thus not fatal to a claim for compensation; rather, under appropriate circumstances it may be "more corroborative of [a claimant's] initial unawareness of the seriousness of the injury resulting from the first incident than it is any cause to doubt [the claimant's] credibility about its occurrence." West v. Bayou Vista Manor, Inc., 371 So.2d 1146, 1150 (La.1979). This is especially true when the delay is of a relatively short duration. Bruno, supra. The workers' compensation law recognizes that the significance of an injury may not be immediately apparent and provides for a limited extension of the prescriptive period when the injury does not "develop immediately after the accident." La. R.S. 23:1209(A).
In this case, the delay from the injury to the reporting of the injury was not of a short duration. Hammock first told a supervisor about his injury some three months after its occurrence. Hammock explained at trial that he had been reluctant to report the accident because he feared that such a report would either impede his chances of becoming a supervisor or might contribute to the closing of the Dodson facility. The WCJ found this testimony not only credible but factually supported by the record. After a careful review of the testimony, we cannot agree that Hammock's fear of reprisal for reporting an accident was justified in fact. No witness testified that an accident report would have adverse consequences for an employee. In fact, those witnesses whose testimony explored the issue in detail explained that reporting of accidents or "near misses" was encouraged for the safety of the employees. The WCJ's finding that Hammock's fear was justified is manifestly erroneous.
Nevertheless, even though Hammock's fear of reprisal was, on this record, misplaced, the record supports the WCJ's finding that this fear was the reason why Hammock did not report his injury. Co-workers who talked with Hammock explained that he expressed to them his fear that an accident report would be held against him. Even when Hammock first reported the incident to his supervisor on November 7, 2002, he asked "how he could go to the doctor with his back without having an accident, you know, claim on the company." Although Hammock's fear of reprisal was unreasonable, it was a genuine and honest explanation for his failure to report the incident for three months.
Thus, we find that the WCJ's decision to credit Hammock's testimony is supported by the record as a whole despite the error in finding that the merits of Mr. Hammock's justification were supported by the testimony. Hammock's co-workers testified that Hammock told them about the incident and his version of events was essentially unchanged. The reports from Hammock's treating physician, Dr. Ehrlich, are likewise generally consistent with Hammock's version of events. Despite the extended delay in reporting the accident, the claimant carried his burden of proving *742 that he suffered a compensable injury as a result of a work-related accident.

Award of TTD benefits
An injured employee seeking TTD benefits must prove by clear and convincing evidence that he is physically unable to engage in any employment, regardless of its nature, including employment while working in pain. La. R.S. 23:1221(1); Lewis v. Chateau D'Arbonne Nurse Care Center, supra. To prove a matter by clear and convincing evidence means to demonstrate that the existence of a disputed fact is highly probable, i.e., much more probable than its nonexistence. Id. A claimant may prove disability through medical and lay testimony. The WCJ must weigh all of the evidence to determine if the claimant has met his burden of proving temporary total disability. Id.
As noted, the claimant testified that he was unable to work because physical activity "usually trigger[s] a migraine with the pain and everything." On December 18, 2002, Dr. Bailey restricted Hammock to light work, and from January 2003 onward, both Dr. Bailey and Dr. Ehrlich ordered that Hammock not work. Again, as noted, on July 1, 2004, Dr. Ehrlich stated in his report, "There is no way he could return to work. It would not be safe." Neither Dr. Ehrlich nor the claimant reported any change in his condition thereafter. Dr. Beurlot's report opined that Hammock could work but only under restrictions to be determined at a functional capacity evaluation. The record does not show that this evaluation was ever performed. The employer cites a letter from the Social Security Administration ("SSA") denying benefits to Hammock because, according to the opinion of the SSA, Hammock's "condition is not severe enough to keep [him] from working." Notably, the letter also refers to Hammock's past position as "a green end supervisor," a job he once held but did not hold at the time of his injury and which was not available to him. Further, the opinion of the SSA is hardly conclusive of the issue, particularly in light of the medical opinion of Hammock's treating physician, Dr. Ehrlich, that Hammock could not work. The WCJ's conclusion that Hammock was temporarily totally disabled is amply supported by the record.

Nature of the Judgment
Weyerhaeuser urges that the WCJ should not have ordered TTD benefits to continue "until plaintiff is released to return to work by Dr. Ehrlich...." and that the WCJ impermissibly ordered future payments of medical benefits, some of which were not related to Mr. Hammock's work-related injury.
Weyerhaeuser argues that this language referring to Dr. Ehrlich is too uncertain to form a part of a judgment and allows a third person, not a judge, the right to control the award of benefits to the claimant. We agree.
La. R.S. 23:1221(1) provides, in part:
(d) An award of benefits based on temporary total disability shall cease when the physical condition of the employee has resolved itself to the point that a reasonably reliable determination of the extent of disability of the employee may be made and the employee's physical condition has improved to the point that continued, regular treatment by a physician is not required.
The "until plaintiff is released to work" language of the judgment conflicts with this article. The judgment specifies an event  the release of the claimant to work by a particular doctor  that is not relevant under the statute under which TTD benefits are paid. La. R.S. 23:1221(1)(d) controls the termination of TTD benefits, and *743 a finding by a treating physician of the ability to return to work is not included in the article as a triggering event for termination of TTD benefits. Accordingly, we amend the judgment to delete the language "until plaintiff is released to return to work by Dr. Ehrlich."
With regard to that portion of the judgment ordering Weyerhaeuser to "provide and pay for all reasonable and necessary medical treatment for the plaintiff's work related injury, as required by law," we find no error. La. R.S. 23:1203 provides in part:
A. In every case coming under this Chapter, the employer shall furnish all necessary drugs, supplies, hospital care and services, medical and surgical treatment....
We construe the WCJ's order to be no more than a restatement of this provision and not an award of future medical expenses. Likewise, the judgment adequately protects the employer against payment for treatment of Hammock's other medical problems that may be unrelated to his work injury.

Offset for medical expenses
The employer urges that the judgment inadequately defined its financial responsibility for Hammock's medical expenses given that some of his expenses were paid by a health insurance plan that was fully funded by Weyerhaeuser. The employer specifically pled the La. R.S. 23:1212 offset in its answer. The distinction between bills paid by the insurer and bills owed by the employer was not tried on the evidence at the hearing, but clearly the employer cannot be called upon to pay the same expense twice. In the absence of language in the judgment requiring the employer to pay the same expenses twice, we find no error in the judgment.

Penalty and attorney fees
Weyerhaeuser argues that the WCJ should neither have awarded statutory penalties and attorney fees, nor have awarded attorney fees of $7,000.00.
La. R.S. 23:1201 provides, in part:
F. Failure to provide payment in accordance with this Section... shall result in the assessment of a penalty ... [that] shall not exceed a maximum of two thousand dollars in the aggregate for any claim.... Penalties shall be assessed in the following manner:
* * * * *
(2) This Subsection shall not apply if the claim is reasonably controverted or if such nonpayment results from conditions over which the employer or insurer had no control.
The court in Brown v. Texas-LA Cartage Inc., 98-1063 (La.12/1/98), 721 So.2d 885, 890, explained the "reasonably controverted" standard:
... Unreasonably controverting a claim ... requires action of a less egregious nature than that required for arbitrary and capricious behavior. Arbitrary and capricious behavior consists of willful and unreasoning action, without consideration and regard for facts and circumstances presented, or of seemingly unfounded motivation. Stated another way, such behavior arises from unrestrained exercise of the will or personal preference or lacks a predictable pattern.
The phrase "reasonably controverted," on the other hand, mandates a different standard. In general, one can surmise from the plain meaning of the words making up the phrase "reasonably controvert" that in order to reasonably controvert a claim, the defendant must have some valid reason or evidence upon which to base his denial of benefits.

*744 Thus, to determine whether the claimant's right has been reasonably controverted ... a court must ascertain whether the employer or his insurer engaged in a nonfrivolous legal dispute or possessed factual and/or medical information to reasonably counter the factual and medical information presented by the claimant throughout the time he refused to pay all or part of the benefits allegedly owed.
Citations and footnote omitted.
Penalties are stricti juris and should be imposed only when the facts clearly negate good faith and just cause in connection with the refusal to pay. Young v. Christus Schumpert Medical Center, 39,593 (La.App.2d Cir.5/11/05), 902 So.2d 1180; Lee v. Schumpert, 36,733 (La.App.2d Cir.1/29/03), 836 So.2d 1214. Nevertheless, a WCJ has great discretion in awarding or denying penalties and attorney fees. Nowlin v. Breck Const. Co., 30,622 (La.App.2d Cir.6/24/98), 715 So.2d 112.
With regard to the award of statutory penalties, we conclude that the WCJ was not manifestly erroneous in finding that the employer failed to reasonably controvert Hammock's claim. Had the employer investigated the claim in detail, it would have discovered that Hammock had spoken with several of his co-workers and consistently related that he had injured himself while moving a load of veneer. Although Hammock's failure to follow company policy and immediately report the incident is a factor in the determination of whether or not the claim is reasonably controverted, it is only a single factor. The employer essentially had no other information to counter the employee's version of events other than the long delay between the incident and the report of the incident.
Finally, the employer contests the amount of attorney fees and argues that it should be reduced. In Ward v. Phoenix Operating Co., 31,656 (La.App.2d Cir.2/24/99), 729 So.2d 109, 113, this court explained the proper method of calculating such an award:
LSA-R.S. 23:1201(F) permits only the imposition of a reasonable attorney fee. The factors to be considered in the imposition of the attorney fee in workers' compensation cases include the degree of skill and work involved in the case, the amount of the claim, the amount recovered and the amount of time devoted to the case.
Although this was not an unusually complicated compensation case, the medical records and other exhibits in this matter are nearly three inches thick and comprise several years of the claimant's medical history. The claimant was represented by two attorneys; the first was retained until July 2004, when he was released and the second was retained. The claimant was deposed while represented by the first attorney, and that deposition is 128 pages long. The claimant's attorney performed skillfully at trial and won an award approaching a value of $50,000.00 for the claimant. We do not find the $7,000.00 fee award to be an abuse of discretion.

CONCLUSION
The judgment of the Office of Workers' Compensation is hereby amended to delete the phrase "until plaintiff is released to return to work by Dr. Ehrlich." In all other respects, the judgment is affirmed. Costs of this appeal are assessed to Weyerhaeuser.

DECREE
As AMENDED, the judgment is AFFIRMED.
NOTES
[1] Hammock also testified, "I'm not exactly sure what month it was."